**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:23-cr-48 (ABJ)** |
| **v.** | : | |
| | : | |
| **WILLIAM JOHN WYATT GALLMAN and** | : | |
| **JOEI LEANN GALLMAN,** | : | |
| | : | |
| **Defendants** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendants William John Wyatt Gallman and Joei Leann Gallman ("the Gallmans") each to 14 days of incarceration, $500 in restitution, and the mandatory $25 special assessment.

I.      **Introduction**

Defendants William John Wyatt Gallman (39 years-old) and Joei Leann Gallman (43)—a married couple who live near Greenville, South Carolina and jointly own and operate a small metal fabrication business—participated in the January 6, 2021, attack on the United States Capitol, a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] Although the Plea Agreements in this matter, filed on May 2, 2023, (ECF Nos. 28, 31 at ¶ 12) reflect a sum of more than $2.8 million dollars for repairs, that estimate has since increased. As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol

The Gallmans each pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G) (Unlawful Parading, Demonstrating, or Picketing in the Capitol Building). As explained herein, a sentence of 14 days of incarceration, $500 restitution, and the mandatory $25 special assessment, is appropriate in this case for each of them because the Gallmans (1) entered the Capitol through the Senate Wing Door while alarms blared and other rioters were entering the building through smashed out windows adjacent to that door; (2) traveled to Statuary Hall and the Rotunda; (3) saw broken windows and multiple uniformed and armed police officers along the way; (4) posed for photographs and took photographs of other rioters; (5) observed violent clashes between rioters and police officers; (6) remained inside the Capitol for approximately 35 minutes; (7) only exited when forced to do so by police officers; and (8) they were not entirely candid during their interviews with FBI agents. On the other hand, the Gallmans have genuinely expressed sincere remorse for their conduct during interviews with FBI agents, and their actions on January 6 appear to be aberrant from their law-abiding and productive behavior since becoming sober in 2017.

The Court must also consider that the Gallmans' conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings. But for their actions alongside so many others, the riot likely would have failed. Here, the facts of and circumstances of the Gallmans' crimes support the government's sentencing recommendation.

---

were $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police (USCP).

The Metropolitan Police Department (MPD) also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

## II.       Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary background exposition, the government refers the Court to the general summary of the attack on the U.S. Capitol contained in the Statements of Offense. ECF Nos. 29, 32 at 1-3.

*The Gallmans' Role in the January 6, 2021, Attack on the Capitol*

In early January 2021, the Gallmans traveled together, along with their friend Alan Scott Culbertson,[2] from South Carolina to Washington, D.C. to attend rallies in support of former President Donald Trump. On January 6, 2021, the Gallmans and Culbertson ("the trio") attended former President Trump's rally on the Ellipse together. Around that time, they posed for the photograph below.



*Exhibit 1: (from left to right) Culbertson, Joei Gallman, and William Gallman near the rally*

---

[2] Culbertson is being prosecuted separately in case number 1:23-cr-65 (ABJ). Like the Gallmans, Culbertson pleaded guilty via plea agreement to one count of violating 40 U.S.C. § 5104(e)(2)(G) (Unlawful Parading, Demonstrating, or Picketing in the Capitol Building). His sentencing is scheduled for November 2, 2023.

The trio then marched to the U.S. Capitol and joined the mob that proceeded *en masse* to the U.S. Capitol's west plaza, where they observed rioters inside the restricted area physically battling police officers amidst clouds of tear gas. The trio watched the chaos but it did not deter them; instead, they pressed forward, following the mob up the exterior stairs to the U.S. Capitol building's second level, known as the Upper West Terrace. There, William Gallman used his cell phone to take photographs and video of the mob overrunning the police and storming the Capitol building. *See* Exhibit 2.



*Exhibit 2: William Gallman using his cell phone to take video and/or photographs on the Upper West Terrace as rioters overrun police, while Joel Gallman and Culbertson observe the chaos*

At approximately 2:13 p.m., rioters used a stolen police riot shield and other objects to smash the windows on either side of the Capitol building's Senate Wing Doors. With the windows shattered, rioters breached the Capitol building for the first time by jumping through the windows over the broken glass. *See* Exhibit 3.



*Exhibit 3: at 2:13 p.m., rioters break into and enter the Capitol building through the windows adjacent to the Senate Wing Door*

At approximately 2:20 p.m.—just seven minutes after the initial unlawful rioter entry depicted above—the Gallmans entered the U.S. Capitol building through the same Senate Wing Door. At the time the Gallmans entered the U.S. Capitol building, an alarm was sounding, other rioters were climbing into the building through broken windows on either side of the Senate Wing Door, and at least one of the windows of the Senate Wing Door itself was broken. The moment the Gallmans entered the Capitol is depicted below. *See* Exhibit 4.



*Exhibit 4: at 2:20 p.m., the Gallmans (indicated with red arrows) entered the Capitol building through the Senate Wing Door*

Culbertson entered the Capitol building through the same door just moments later and rejoined the Gallmans inside.

Over the next 35 minutes, the Gallmans walked throughout the U.S. Capitol building. Along the way, they observed many uniformed and armed police officers, experienced the crush of the crowd in the hallways, and saw rioters in physical conflict with police officers. Throughout their time in the Capitol building, the Gallmans took photographs and recorded videos of other rioters. *See* Exhibits 5-8.

From the Senate Wing Door, the trio walked down a hallway, following the crowd of invading rioters. *See* Exhibit 5.



*Exhibit 5: the Gallmans (indicated with red arrows) walking through a Capitol hallway shortly after entering the building*

The hallway led to the Crypt, which by that point was full of rioters whose progress had been blocked by a small group of police officers. The Gallmans and Culbertson, who were far

from the front line of rioters confronting the line of police officers, were temporarily stymied by the bottleneck that formed. After only a few minutes, however, rioters broke through the police line and walked up the stairs leading to the Capitol's third level. The trio followed the crowd up the stairs, finding themselves in Statuary Hall, which they walked through, using their phones to capture what they saw. *See* Exhibit 6. Surveillance video shows that after other rioters knocked over some of the stanchions and velvet ropes in Statuary Hall, the Gallmans helped pick them up and reset them.



*Exhibit 6: the Gallmans and Culbertson (yellow box) walking through Statuary Hall as Joei Gallman displays an image on her cell phone*

After leaving Statuary Hall, the Gallmans walked, pressed body-to-body with other rioters, down a crowded hallway leading to the Rotunda. *See* Exhibit 7.



*Exhibit 7: the Gallmans and Culbertson (boxed in yellow) pressed body-to-body with other rioters in a Capitol hallway after leaving Statuary Hall*

The trio spent several minutes in the Rotunda, mostly taking photographs with their cell phones. *See* Exhibit 8.



*Exhibit 8: William Gallman and Culbertson (vertical red arrows) taking photographs in the Rotunda while Joei Gallman (horizontal red arrow) looks on*

At approximately 2:54 p.m., the trio was standing in a hallway adjacent to the Rotunda when a reinforcement group of uniformed police officers wearing riot gear and neon yellow jackets entered the hallway. The trio compliantly stood to the side to let the procession of officers walk past them. When the group of new officers reached the end of the hallway farthest from the Capitol's exterior door (i.e. the innermost point of the hallway), the officers turned around and executed an organized group maneuver to clear the rioters from the hallway and force them out of the building. Specifically, the officers—now facing the rioters and the exit—raised their batons parallel to the floor and began shouting in unison, "Move back! Move back!" The group of officers then steadily walked forward, toward the building exit, forcing the unlawfully occupying mob to move in that direction. The officers pushed resistant rioters in the back with the sides of their batons. William Gallman and Culbertson did not immediately leave the hallway, and thus William Gallman was one of the slow-moving rioters pushed in the back by the police, but he does not appear to have physically resisted the officers. *See* Exhibit 9.[3]



*Exhibit 9: William Gallman and Culbertson being pushed by police working to clear the hallway outside the Rotunda*

[3] Exhibit 9 is a screenshot from a MPD officer's body worn camera video. That video is publicly available at https://propublica-data-j6cases-videos.s3.us-east-1.amazonaws.com/b7a6b0c01e75013acc422cde48001122.mp4?_ga=2.33327806.1204253088.1638647062-233311640.1635534856 (last accessed August 14, 2023).

Meanwhile, Joei Gallman was standing against a nearby wall, having become separated from her husband and Culbertson. The trio reunited just before the building exit.

Ultimately, the officers succeeded in forcing the rioters gathered in that hallway—including the Gallmans and Culbertson—to exit the building. The trio finally exited the Capitol building at approximately 2:55 p.m. through a door on the eastern side of the building, approximately 35 minutes after they had entered.



*Exhibit 10: the Gallmans (yellow box) and Culbertson (red arrow) exiting the Capitol building*

The Gallmans were aware that the Senate intended to tally the Electoral College votes, and thus certify the 2020 presidential election of Joseph R. Biden, on January 6, 2021, the same day that they entered and participated in the occupation of the Capitol building. Both Gallmans have admitted that they knew at the time they entered the U.S. Capitol Building that they did not have

permission to do so, and they engaged in disorderly and disruptive conduct in the Capitol Building with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress.

*William Gallman's FBI Interviews*

FBI agents conducted three voluntary interviews of William Gallman. He admitted to all of the conduct described above, including unlawfully entering the Capitol building on January 6, 2021, which he characterized as the biggest mistake of their lives. William Gallman stated that they were in the wrong place at the wrong time, and "got in with the crowd." He said that as the mob advanced on the Capitol he should have turned around, but he didn't because he was "swept up in the emotion of it." He also stated that "if we had it to do over with again, we would not have went."

William Gallman confirmed his identity, as well as Joei Gallman's and Culbertson's (*see infra*), in photographs and videos capturing the trio unlawfully inside the Capitol building. William Gallman then provided agents with Culbertson's phone number and stated that he (Culbertson) had driven with them from South Carolina to Washington, D.C. William Gallman also consensually allowed FBI agents access to his home, where he voluntarily produced and allowed the agents to photograph clothing that he and Joei Gallman were wearing on January 6, 2021.

While William Gallman was generally cooperative, forthcoming, and truthful in each interview, his account of the group's exit from the Capitol building differed slightly from the events captured by video surveillance. William Gallman stated that officers told them which way to exit as they walked the halls of the Capitol building and they (the trio) complied with those directions. But this is inconsistent with the length of time the trio remained inside the Capitol building (35 minutes) and omits that even after a group of riot gear clad officers wearing neon yellow jackets advanced *en masse* down the hallway, shouting "Move back!" in unison, William

11

Gallman did not turn around and leave the building until one of those officers pushed him in his back with a baton.

*Joei Gallman's FBI Interviews*

FBI agents conducted two voluntary interviews of Joei Gallman, both with William Gallman present, at her insistence. She admitted to all of the conduct described above, including unlawfully entering the Capitol building on January 6, 2021, which she regretted, and chanting along with other rioters. Joei Gallman explained that at the time, they felt as though their vote did not matter, that they were part of something important, and that by marching on the Capitol they would be heard. In retrospect, she realized that she did not know what she was getting into and wished they had never gone to Washington, D.C. Nevertheless, Joei Gallman minimized her responsibility for her actions on January 6, claiming that they only entered the Capitol building and roamed inside because they had to "go with the crowd or get run over."

Joei Gallman confirmed her and William Gallman's identities in photographs and videos but, when shown a photograph of herself and William Gallman standing next to Culbertson inside the Capitol building, falsely stated that she did not know the other man in the photo (*i.e.* Culbertson). William Gallman then identified Culbertson as a family friend, provided his name and phone number, and stated that Culbertson drove with them from South Carolina to Washington, D.C.

According to Joei Gallman, she decided to exit the Capitol building when they were stopped next to a door being guarded by a police officer and observed an older man nearby reading a book in a foreign language. She stated that as they walked down a hallway toward the exit, she briefly got separated from William Gallman and Culbertson, became claustrophobic in the crowd,

and retreated to catch her breath, where she reunited with William Gallman and Culbertson. The trio then exited the building. Her account is consistent with video surveillance.

*The Charges and Plea Agreement*

On February 15, 2023, the United States charged the Gallmans via a one-count information with violating 40 U.S.C. § 5104(e)(2)(G). ECF No. 7. After several continuances to allow defendants' attorneys time to secure *pro hac vice* admission, on May 2, 2023, the Court held a hearing in which both Gallmans pleaded guilty to the Information pursuant to plea agreements. *See* ECF Nos. 15-32. By plea agreement, the Gallmans each agreed to pay $500 in restitution to the Architect of the Capitol.

**III.       Statutory Penalties**

The Gallmans both now face sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, The Gallmans face up to six months of imprisonment and a fine of up to $5,000. The Gallmans must also pay restitution under the terms of their plea agreements. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As their offenses are Class B Misdemeanors, the Sentencing Guidelines do not apply to them. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

**IV.       Sentencing Factors Under 18 U.S.C. § 3553(a)**

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 14 days of incarceration, $500 in restitution, and the mandatory $25 special assessment.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing the Gallmans' participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for misdemeanor defendants like the Gallmans, the absence of violent or destructive acts is not a mitigating factor. Had the Gallmans engaged in such conduct, they would have faced additional criminal charges.

One of the most important factors in the Gallmans' cases is the fact that they entered the Capitol building through the Senate Wing Door just seven minutes after it was first breached, making them part of the initial wave of rioters that quickly overwhelmed police officers and provided the rioters with nearly unfettered access to the Capitol's chambers, offices, hallways, and other sensitive areas. They then roamed the Capitol for approximately 35 minutes, only leaving when police officers physically forced them to exit. While the Gallmans did not wear tactical gear or engage in violence, the true strength of the rioters was in the mob's sheer numbers, and they added to that power. Moreover, although the Gallmans were cooperative, forthcoming, and remorseful during their interviews with FBI agents, neither of them was perfectly candid.

### B.  The History and Characteristics of the Gallmans

Prior to their conduct on January 6, 2021, both Gallmans appear to have led productive, law-abiding lives as adults, other than their habitual drug and alcohol usage before they both achieved sobriety in 2017. *See* William Gallman PSR ¶¶ 45-47; Joei Gallman PSR ¶¶ 45-46.

14

Neither Gallman has any criminal history. *See* William Gallman PSR ¶¶ 27-32; Joei Gallman PSR ¶¶ 27-32. They jointly own and run a small metal fabrication business that employs three people full-time.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

*Specific Deterrence*

The Gallmans' actions during the riot demonstrate the need for specific deterrence. According to their FBI interviews, as well as each of their sentencing memoranda, the Gallmans entered and roamed the Capitol without thinking critically about their actions; they just followed the crowd. The Court must sentence them in a way that inhibits them from acting like lemmings again in the future.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[4] This Court must sentence the Gallmans based on their own conduct and relevant characteristics, but should give substantial weight to the context of their unlawful conduct: their participation in the January 6 riot.

The Gallmans have pleaded guilty to Count One of the Information, charging them with Unlawful Parading, Demonstrating, or Picketing in the Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing

---

[4] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in

17

the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan)

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out,

you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range of for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr. at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, this Court has sentenced other defendants convicted of petty offenses to incarceration. The sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

The two cases that provide the closest match to the most salient aspects of this case are *United States v. Lattanzi*, 1:22-cr-28 (TSC) and *United States v. Ferreira*, 1:22-cr-210 (TSC). In both cases, Judge Chutkan sentenced the defendants—who pleaded guilty to violating 40 U.S.C. § 5104(e)(2)(G), the same charge as the Gallmans—to 14 days of incarceration and $500 in restitution, the same sentence the government recommends here.

Like the Gallmans, Nicholas Lattanzi entered the U.S. Capitol building through the Senate Wing Door, although he did so at 3:22 p.m., just over an hour after the Gallmans and long after police had been overwhelmed. After entering the building, Lattanzi walked a short distance before encountering a police officer, who stopped him and directed him to leave the building. Lattanzi instantly complied: he turned around and went back the way he had come, exiting the Capitol through the Senate Wing Door just five minutes after he had entered. When FBI agents approached Lattanzi three months later, he admitted being in Washington, D.C. on January 6, 2021, but falsely denied having entered the Capitol building. The next day, an attorney representing Lattanzi contacted the FBI and informed the agents that Lattanzi wished to amend his statement. Lattanzi then came clean. He admitted entering the U.S. Capitol building and noticing that the window of the Senate Wing Door was broken at the time. Lattanzi also acknowledged that the flag he was holding during the riot had become stained with blood and mace. Lattanzi's case is generally on par with the Gallmans'. While his conduct on January 6, 2021 was less culpable than the Gallmans'—he entered far later, did not film or photograph, did not roam the building, left immediately after an officer verbally told him to do so, and spent only five minutes inside—Lattanzi brazenly lied about the most fundamental issue during his first FBI interview.

Leticia Ferreira's conduct at the U.S. Capitol on January 6, 2021 was worse than Lattanzi's, but Judge Chutkan imposed the same sentence in their cases. On balance, Ferreira's case is

comparable to the Gallmans' as well. Like the Gallmans, Leticia Ferreira decided to follow the mob storming the U.S. Capitol building despite seeing police officers use tear gas and other serious techniques in an effort to control and repel the crowd, entered the U.S. Capitol building through the Senate Wing Door shortly after it was breached, remained in the building for an extensive period of time (45 minutes), and was not entirely truthful about her participation in the riot when interviewed by FBI agents. The government acknowledges that *Ferreira* involved aggravating factors that the Gallmans' cases do not— Ferreira entered the Capitol five minutes earlier than the Gallmans (just 90 seconds after the window adjacent to the Senate Wing Door was first smashed and breached), followed on the heels of a group of rioters in the Crypt who forced their way through a line of USCP officers who were attempting to stop the advance of the crowd, denied observing violence despite the fact that she was captured on surveillance video filming physical conflict between rioters and police officers, stayed inside the building for 10 minutes longer than the Gallmans, and did not express remorse during her voluntary interview with the FBI. Nevertheless, those aggravators are balanced by the fact that Ferreira exited the U.S. Capitol building of her own accord, unlike the Gallmans, who were forced out by police.

Even if the Court finds 14 days of incarceration to be a harsher sentence than the Gallmans' deserve, the Court should not sentence the Gallmans to any less than 30 days of home detention as a condition of 36 months of probation, which was the sentence imposed in two other comparable cases, *United States v. Susan Manwaring*, 1:22-cr-307 (CJN), and *United States v. Joshua Bustle*, 1:21-cr-238 (TFH).

Susan Manwaring and her adult son Landon, who was separately prosecuted, followed a similar path as the Gallmans. The Manwarings approached the Capitol building from the west, observing similar confrontations between the mob and police, worked their way through the crowd,

and followed other rioters up the exterior stairs leading to the Upper West Terrace, all just like the Gallmans. The Manwarings then entered the U.S. Capitol building through the Senate Wing Door at 2:23 p.m., just three minutes after the Gallmans entered through the same door. Once inside the building, the Manwarings, like the Gallmans, roamed to the Crypt, Statuary Hall, and the Rotunda, taking photographs and videos along the way, although the Manwarings also breached a more sensitive area—the lobby of the Speaker's office suite, which is never open to the general public— that the Gallmans did not access. In total, the Manwarings spent 25 minutes inside the Capitol building, 10 minutes fewer than the Gallmans. Like the Gallmans (as well as like Lattanzi and Ferreira), the Manwarings did not communicate on social media about January 6, spread disinformation, or boast about their actions at the Capitol. The Manwarings were also similarly cooperative with the FBI's investigation of them and resolved their cases with immediate plea agreements. Nevertheless, Susan Manwaring—like the Gallmans—minimized aspects of her conduct. Ultimately, Judge Nichols sentenced Susan Manwaring to 30 days of home detention as a condition of a 36 month term of probation and ordered her to pay $500 in restitution.[5]

Similarly, in *United States v. Joshua Bustle*, 1:21-cr-238 (TFH), the defendant and his co-defendant wife, Jessica Bustle, unlawfully entered the U.S. Capitol on January 6, 2021, through damaged doors featuring broken windows while alarms blared. The Bustles then roamed the building for approximately 20 minutes while carrying signs protesting the government's efforts to vaccinate the population against COVID-19. Like the Gallmans and the Manwarings, the Bustles fully cooperated with the FBI's investigation of them and rapidly resolved their cases with plea

---

[5] Although Landon Manwaring engaged in the same conduct as his mother on January 6, Judge Nichols imposed a stiffer sentence on him—30 days of incarceration followed by 35 months of probation—largely because between January 6, 2021 and his sentencing, Landon Manwaring committed another felony, for which he was separately prosecuted by state authorities. *See United States v. Landon Manwaring*, 1:22-cr-270 (CJN), ECF Nos. 19-20.

agreements. Judge Hogan sentenced Joshua Bustle to 30 days of home detention as a condition of 24 months of probation and ordered him to pay $500 in restitution. Meanwhile, Judge Hogan imposed a stiffer sentence against Jessica Bustle—60 days of home detention as a condition of 24 months of probation—because she, unlike Joshua Bustle, Susan Manwaring, or the Gallmans, wrote a series of incendiary posts on Facebook before, during, and after the riot that spread misinformation, celebrated the crimes committed that day, and called for more violence.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.[6]

---

[6] Numerous judges of this Court have concluded that a sentencing court in a case involving a violation of a Class B misdemeanor under 40 U.S.C. § 5104 may impose a "split sentence" – a period of incarceration followed by a period of probation – for defendants convicted of federal petty offenses. See, e.g., 18 U.S.C. § 3561(a)(3); *see, e.g., United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that "a split sentence is permissible under law and warranted by the circumstances of this case"); *see generally* Appellee's Brief for the United States, *United States v. Little*, No. 22-3018 (D.C.) (filed Aug. 29, 2022). Approximately nine judges of this district have authorized and imposed such split sentences pursuant to law. *But see United States v. Panayiotou*, No. 22-CR-55 (DLF), 2023 WL 417953 (D.D.C. Jan. 25, 2023) (holding that such sentences are impermissible under Section 3561(a)(3)).

## V.     Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[7] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction,

---

In the alternative, courts have also issued sentences under 18 U.S.C. § 3563(b)(10), which authorizes limited periods of intermittent confinement as a condition of probation. The courts have consistently found that such a sentence is permissible for up to two weeks' imprisonment served in one continuous term. *See, e.g., United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history in interpreting the term to mean a "brief period of confinement, e.g., for a week or two, during a work or school vacation," described above and reversing magistrate's sentence that included 30-day period of confinement as a period condition of probation). To this end, at least four of the judges of this Court have imposed sentences under §3563(b)(10). Indeed, a sentencing court may also impose multiple intervals of imprisonment under §3563(b)(1). *See United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992); *Panayiotou*, 2023 WL 417953, at *9 ("in a case in which the government exercises its prosecutorial discretion to allow a defendant to enter a plea to a single petty misdemeanor, it can request that a court impose a sentence of intermittent confinement as a condition of probation.") (citing 18 U.S.C. § 3563(b)).

In this district, at least two judges have similarly imposed multiple terms of imprisonment, to be served intermittently, consistent with this subsection. Such sentences are particularly appealing in light of the fact that it has been nearly three years since the World Health Organization first declared the COVID-19 outbreak a global pandemic in March 2020, and over two years since the first COVID-19 vaccine was administered in the United States in December 2020, allowing detention facilities to now more safely handle the logistical and practical concerns associated with multiple stints of imprisonment.

[7] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," and any offense "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering

from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to

impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement."

*See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted

under 18 U.S.C. § 3663(a)(3), that both Gallmans must pay $500 in restitution, which reflects in

part the role the Gallmans played in the riot on January 6.[8] Plea Agreement at ¶ 12. As the plea

agreements reflect, the riot at the United States Capitol had caused "approximately $2,881,360.20"

in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other

governmental agencies as of October 14, 2022. *Id.* (As noted above in footnote 1, the amount of

damages has since been updated by the Architect of the Capitol, USCP, and MPD.) The Gallmans'

restitution payment must be made to the Clerk of the Court, who will forward the payment to the

Architect of the Capitol and other victim entities. *See* William Gallman PSR ¶ 79; Joei Gallman

PSR ¶ 77.

## VI.   Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these

factors, the government recommends that this Court sentence each defendant to 14 days of

incarceration, $500 restitution, and the mandatory $25 special assessment. Such a sentence protects

the community, promotes respect for the law, and deters future crime by imposing restrictions on

---

[8] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

their liberty as a consequence of their behavior, while recognizing their acceptance of responsibility for their crimes.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:        */s/ Michael M. Gordon*
MICHAEL M. GORDON
Florida Bar No. 1026025
Assistant United States Attorney, Detailee
400 N. Tampa St., Suite 3200
Tampa, FL 33606
(813) 274-6370
michael.gordon3@usdoj.gov